| NOTICE | | FILED |
|---|---|---|
| This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1). | 2020 IL App (4th) 200173-U | August 20, 2020<br>Carla Bender<br>4th District Appellate<br>Court, IL |

NOS. 4-20-0173, 4-20-0174, 4-20-0175, 4-20-0176, 4-20-0177, 4-20-0178 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* N.C.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
| Petitioner-Appellee, | ) | No. 16JA3 |
| v.   (No. 4-20-0173) | ) | |
| Nakia P., | ) | |
| Respondent-Appellant). | ) | |
| ————————————————————— | ) | |
| *In re* N.R.P., a Minor | ) | No. 16JA4 |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.   (No. 4-20-0174) | ) | |
| Nakia P., | ) | |
| Respondent-Appellant). | ) | |
| ————————————————————— | ) | |
| *In re* Nai. H., a Minor | ) | No. 16JA5 |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.   (No. 4-20-0175) | ) | |
| Nakia P., | ) | |
| Respondent-Appellant). | ) | |
| ————————————————————— | ) | |
| *In re* Neh. H., a Minor | ) | No. 17JA21 |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.   (No. 4-20-0176) | ) | |
| Nakia P., | ) | |
| Respondent-Appellant). | ) | |
| ————————————————————— | ) | |

| *In re* Nay. H., a Minor | ) | No. 17JA22 |
| | ) | |
| (The People of the State of Illinois, | ) | |
|         Petitioner-Appellee, | ) | |
|         v.   (No. 4-20-0177) | ) | |
| Nakia P., | ) | |
|         Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* Nas. H., a Minor | ) | No. 17JA23 |
| | ) | |
| (The People of the State of Illinois, | ) | |
|         Petitioner-Appellee, | ) | |
|         v.   (No. 4-20-0178) | ) | Honorable |
| Nakia P., | ) | John C. Wooleyhan, |
|         Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, granting appellate counsel's motion to withdraw and finding the trial court's decision to deny respondent's motion for change of venue and grant the State's motion terminating respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    In January 2018, we affirmed the trial court's adjudication of neglect and revocation of respondent Nakia P.'s continuance under supervision order. *In re N.C.P.*, 2018 IL App (4th) 170710-U. This matter proceeded toward resolution, with the State filing a motion for termination of parental rights against respondent-mother in June 2019. After several continuances at respondent's counsel's request, and after a full hearing, the court granted the State's petition for termination of respondent's parental rights in February 2020.

¶ 3    On appeal, respondent's appointed counsel filed a "Motion to Withdraw as Counsel on Appeal," pursuant to *Anders v. California*, 386 U.S. 738 (1967), stating he "was unable to construct an argument on behalf of respondent in support of a meritorious claim in her

appeal." In a supporting brief, appellate counsel explained why he concluded respondent's claims present no potentially meritorious issues for review.

¶ 4    On May 19, 2020, we notified respondent of appellate counsel's motion and indicated she could file a response thereto by June 9, 2020. The notice came back undeliverable and with no forwarding address. Respondent filed no response. Therefore, we grant appellate counsel's unopposed motion to withdraw from representing respondent, proceed to the merits, and affirm the trial court's judgment.

¶ 5                          I. BACKGROUND

¶ 6    We first note a more detailed recitation of facts preceding the appeal of the initial adjudication and disposition was presented in *N.C.P.*, 2018 IL App (4th) 170710-U and will not be repeated except where relevant to the court's ruling. There, we affirmed the trial court's January 2018 order revoking a previous "Continuance Under Supervision" order as well as the dispositional order finding the minors neglected and placing custody and guardianship with the Department of Children and Family Services (DCFS). In the matter currently before us, the termination of respondent's parental rights relate to N.C.P. (born in 2006), N.R.P. (born in 2007), Nai. H. (born in 2009), Neh. H. (born in 2012), Nay. H. (born in 2014), and Nas. H. (born in 2014).

¶ 7               A. Termination of Respondent's Parental Rights

¶ 8    In June 2019, the State filed a motion for termination of parental rights, seeking a finding of unfitness and termination of parental rights of respondent. Specifically, the State alleged respondent (1) failed to make reasonable efforts to correct the conditions which were the basis for the removal of the child from the parent and (2) failed to make reasonable progress toward the return of the child within two specific nine-month time periods after an adjudication

of neglect under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1 *et seq.* (West 2018)). In July 2019, the trial court held a hearing on respondent's motion for a change of venue regarding respondent's two children in residential placement. After arguments, the court denied the motion and set the case for a future status date. In November 2019, the State filed an amended notification alleging only one nine-month time period between March 3, 2019, and December 2, 2019, where respondent failed to make reasonable efforts and progress. The State's petition asked that termination be found to be in the best interests of the minors and requested DCFS retain custody and guardianship over the minors with the authority to consent to their adoption.

¶ 9　　　　After several continuances, the trial court held a fitness hearing in February 2020. By this time, the only father who had been specifically identified and present for some of the proceedings had already executed surrenders of parental rights as to his children. None of the other alleged fathers ever appeared. Respondent failed to appear for this hearing; her attorney, representing she moved out of the area, requested a continuance. The trial court noted the case had been pending for some time, having been open since January 2016, with the State's motion for termination being filed June 2019. The court further noted the last order of the court sent to respondent was returned "showing that it could not be delivered as addressed and it was unable to be forwarded." After citing the numerous delays by the parties and that proper notice was provided to respondent, the court proceeded with the hearing. At the request of the State, the court took judicial notice of the petitions for adjudication, the order of findings and adjudication, the dispositional order, and that respondent's visitation rights were suspended in May 2019 and never reinstated.

¶ 10 The State's first witness, Robin Lease, was a visitation specialist for Chaddock Foster and Adoption (Chaddock), responsible for transporting children to visits with their biological parents and observing their interactions. She assisted in visitation supervision for the minors and respondent. She testified she was scheduled to supervise a visit between respondent and the minors on March 6, 2019, but respondent failed to attend. Respondent was scheduled to have two other visits in March, but they never took place because respondent failed to contact the agency and confirm the visitation appointment as she was required to do. Due to her previous failures to appear for visitation, respondent was to contact the visitation supervisor to confirm she would appear. Lease recalled three other visits scheduled for April 2019, and ultimately canceled due to respondent's failure to contact the agency and confirm them. All visits were to be supervised and respondent never progressed to the point where she had unsupervised visitation. Lease explained how sometimes when respondent failed to show up for visits, the minors were already transported to the scheduled meeting place waiting for her. Initially, the minors would be upset their mother failed to arrive, but eventually they were "used to the parents not coming to see them." She did not supervise any more visits after April 2019 because respondent's visitation was suspended.

¶ 11 Katie Brink, another visitation specialist at Chaddock helped coordinate and supervise visits from February 2019 to April 2019. She testified she informed respondent she was responsible for bringing a meal for the children during visits. She recalled a visit in March 2019 where respondent brought hair products but no food. Instead, Brink obtained sack lunches for the children because they were hungry. During the time Brink supervised visits, respondent failed to show for four visits in March and four visits in April. Like the scheduled visits with Lease, the minors would arrive at the scheduled meeting destination waiting for respondent, who

never came. Brink said when respondent failed to show up, the minors were "sad, they would cry, they felt let down."

¶ 12 Christopher Powell, a child protection specialist at Chaddock for the previous seven and a half years, was assigned to provide case management services to respondent and her children. He was present and able to verify the surrenders executed by respondent-father, I.H., with regard to four of the six children. He explained the process for conducting an integrated assessment and formulating a service plan. Powell explained how the terms of respondent's September 5, 2019, service plan included cooperating with the agency, maintaining consistent appointments with the caseworker, complying with court orders, maintaining stable and appropriate housing to suit the needs of the minors, and to cooperate with any assessments or evaluations for mental health counseling, parenting classes, or domestic violence services, perform random drug screens, and complete any recommended services. Powell testified respondent was rated unsatisfactory as to parenting and visitation because "she had missed several of her visits with her children" and some of the visits she did attend were terminated early due to her behavior. She was never consistent in attending visits, which resulted in the suspension of visitation "because of her lack of involvement in her visits." Powell testified he also rated her unsatisfactory for her cooperation with the agency. He stated she was very unreliable in meeting with him on a consistent basis and, when they did meet, she was difficult to engage and very uncooperative. He also rated respondent unsatisfactory in housing, mental health, and domestic violence services. He stated that her small one-bedroom apartment was often dirty and unsuitable to house her six children. She was inconsistent in her attendance for her mental health treatment to the point where she was unsuccessfully discharged, and she never engaged in domestic violence services. Powell said the permanency goal by the time of the

September 5, 2019, service plan had been changed by the trial court to "substitute care pending court determine [*sic*] of termination of parental rights."

¶ 13     Powell also said during the time he was supervising her case, respondent would not provide reliable telephone numbers and he could not conduct a home visit since she was never present and would not contact him after he left contact information for her to do so. He described his unsuccessful attempts to notify her of an administrative case review meeting and provide her a copy of her service plan, testifying that even after scheduling a home visit with respondent, she failed to appear. When he was eventually able to contact her and express his concern for her failures to appear at scheduled visits, she acknowledged receiving the copy of the service plan; however, she explained that "she was mad at the format of how the visits were set up." Powell said she was scheduled to see two children each visit with three visits scheduled during any given week. This came about because of the "chaotic" nature of visits if they were all together, as well as "concerns with some of the older children sexually perpetrating on the younger children." He said respondent had been asked to provide a copy of her work schedule and never did. When she expressed "disagreements" with her service plan, she was advised to attend the family team meeting to address her concerns. She did not attend. When she said she had "health issues" which prevented her from attending many of the missed visits, Powell testified he told her he "needed medical records to verify any visit or any meeting that she had missed that would correlate and correspond with a medical event." Although respondent said she understood and would provide the necessary documentation, other than one record, which did not correspond with a missed visit, she failed to do so. When she provided the same excuse for missing the family team meetings where she could discuss her concerns with DCFS staff, Powell

informed her of the need to provide documentation of the medical reasons for her absence, which again was never forthcoming.

¶ 14        In April 2019, Powell was eventually successful in conducting a home visit of respondent's apartment, which he found "cluttered," and "things were kind of piled up and packed together." He also found she was using the stove as a heat source for the apartment because she had no electricity. Returning in May 2019, Powell again advised her to clean up the residence. When he saw her in July 2019, during a visit with one of the fathers, respondent said she was not staying in her own apartment at that time because she had no electricity. His efforts to meet with her in September, October, and November 2019 were unsuccessful. Although he attempted to contact respondent using the telephone numbers she provided, he was not able to do so. Respondent's last contact with Powell was an e-mail at the end of November 2019 to inform him she was no longer in the Quincy area. She refused to provide him with an address or location.

¶ 15        No other evidence was presented. The trial court noted the adjudication took place on August 10, 2017, and the dispositional hearing was on September 18, 2017 (two years and five months before). After finding each putative father unfit, the trial court looked to the relevant nine-month period from March 2019 to December 2019, and it found the evidence indicated the mother's failure to attend visits during the months of March and April 2019 resulted in visitation being suspended "pending further order of the Court until such time as the mother would become fully engaged in services. That apparently never happened." The court went on to point out that after the visits were suspended, they were never reinstated and "there was no request for reinstatement of services by the mother after May of 2019." Her contact with her caseworker was sporadic, and the caseworker went to great lengths in his attempt to contact her through personal

visits, e-mail, and phone calls, which usually went unanswered. The mother never maintained suitable housing, participated in mental health or domestic violence counseling, and lacked sufficient progress to return the minors back to the home. The court noted one of the very few times respondent contacted the caseworker was to inform him that she left the area and would not provide him with any contact information or where she was staying. The court found each of the allegations of unfitness alleged in the motion was proved by clear and convincing evidence, specifically finding respondent failed to make reasonable efforts to correct conditions that formed the basis for removal and failed to make any reasonable progress to warrant the return of the minors within the relevant nine-month time period.

¶ 16                                B. Best-Interests Hearing

¶ 17        After a brief recess in the proceedings, the court proceeded to a best-interests hearing. The State recalled Christopher Powell, who described where each of the respondent's six children were placed, noting "they all have some behaviors and have some issues" that require some level of specialized care. They all exhibited medical or mental health problems when they came into foster care.

¶ 18        Powell testified Nay. H and Nas. H., both five years old, have been in their original specialized foster care placement since May 2017 and they have a relationship with their foster parents that is "extremely good," viewing them as "mom and dad." Powell visits them three times a month. Powell described them as being in a nurturing environment where their educational, medical, and mental health needs are being met. They were both diagnosed with attention deficit hyperactivity disorder (ADHD), and Nay. H. also has an oppositional defiant disorder (ODD) diagnosis. They have been integrated into the extended family. They have individualized education plans, and their foster parents follow up with all necessary

appointments and services, taking part in their education and their overall well-being. The foster parents have expressed a willingness to adopt. Powell described Neh. H., age seven, similarly, testifying his foster parents "give him a lot of affection," are involved with his education, and make sure all of his medical and counseling needs are met. He has been at this placement approximately one and a half years, having been moved several times due to difficult behaviors. Powell sees him "at least once a month." Neh. H. has gone on family vacations with his foster family and is very close to them as well as their extended family. Neh. H. was discovered to have ADHD, post-traumatic stress disorder, depression, and reactive attachment disorder once he came into care. His foster parents ensure he receives the necessary therapy and counseling to address his mental health issues, as well as his psychiatric medication management. They follow up with all his appointments and participate in his education and have also expressed a willingness to adopt. Nai. H., age 10, has been at her residential facility placement for approximately one and a half years. She previously had very aggressive behaviors in foster care, which led to residential placement. Powell sees her once a month and testified she "seems to be pretty happy" in her current placement. Although it was an adjustment, Powell said "she is very bonded to staff there," has good peer relationships, and is having all her medical, emotional, and educational needs met. She has contact with her extended family and has regular communication or visits with family or previous foster parents. Nai. H. has a diagnosis of ADHD and ODD. She is receiving therapy, counseling, and psychiatric medication management. The residential staff ensure she attends all counseling and appointments. For the future, DCFS is looking at specialized foster care for Nai. H. Powell testified N.R.P, age 12, is placed at a residential facility in Peoria, where he has resided for the last two years. Because of developmental delays and some aggressive behaviors, his need for a more structured environment with additional services

eventually ruled out foster placement. Powell sees him once a month. He continues to need "a lot of services," and although he has "a few" positive staff relationships, they are more so at school than in his "cottage" or home. He has been approved for a psychological evaluation, which should help determine his needs. N.R.P. has some contact with an aunt who talks to him by phone and has visited and has other aunts from his father's side of the family who have shown an interest. N.R.P. has a diagnosis of ADHD and ODD and receives therapy, counseling, and psychiatric medication management through the facility. DCFS is currently investigating a "step down" placement, which could involve guardianship by a relative or possible foster placement with fictive kin. N.C.P., who is 14 years old, initially had a number of different placements due to her behaviors, both in school and at home, but has "really excelled with her maternal grandmother" in Indiana since May 2019 according to Powell. He sees her every six months since hers is an interstate compact case, monitored monthly by the Indiana Department of Child Services. Since residing with her grandmother, N.C.P.'s behaviors, health, attitude, and grades have improved. She continues to have contact with extended family. N.C.P. is the only child who does not have a mental health diagnosis. The grandmother has expressed her willingness to adopt. Powell stated none of the minors have had contact with respondent since May 2019 after her visitation was suspended.

¶ 19    The trial court found that the four children who reside in foster placements have bonded with their foster parents and family, that all of their needs are being met, and the foster parents have stated a willingness to provide permanency for those minors through adoption. Regarding the two minors in residential placements, the court found they are bonding with people in their respective placements and those placements are meeting all their needs. The court acknowledged the agency's plan to have them transition to "non-residential placements of a pre-

adoptive nature." The trial court found there was no evidence showing respondent had a recent relationship with any of the children or would be able to provide them a permanent and stable home anytime in the near future. Noting the statute requires the minors to receive permanency as soon as possible, the court found the State proved by a preponderance of the evidence it is in the best interests of the minors to terminate respondent's parental rights and their best opportunity for permanence is with their current respective placements.

¶ 20    This appeal followed.

¶ 21                                II. ANALYSIS

¶ 22    On appeal, respondent's attorney filed a motion to withdraw as counsel with a supporting memorandum.

¶ 23    In the matter before us, respondent's attorney suggests any appeal in this cause would be frivolous because he found no appealable issues in this case. Reviewing the proceedings on the motion for change of venue, the unfitness hearing, and the best-interests hearing, counsel saw no irregularities in the trial process or other potential errors that could be a basis for a meritorious argument on appeal. Furthermore, counsel noted the State's evidence during the unfitness and best-interests hearing went uncontroverted since respondent failed to appear for both proceedings. Our review of the record and the applicable law leads us to conclude counsel is correct. Accordingly, we grant his motion to withdraw.

¶ 24                                A. Venue

¶ 25    Counsel argues there are no appealable issues extant in the trial court's denial of respondent's venue motion. We agree. The Juvenile Court Act states venue lies in the county where the minor resides or is found. 705 ILCS 405/2-2(1) (West 2018). Section 2 relates to transfers, providing: "If proceedings are commenced in any county other than that of the minor's

residence, the court in which the proceedings were initiated may at any time before or after adjudication of wardship transfer the case to the county of the minor's residence \*\*\*." 705 ILCS 405/2-2(2) (West 2018). "[T]he legal residence of the child does not technically affect the jurisdiction of the court [considering a neglect petition], so long as the child is physically present within the State." *In re Gonzales*, 25 Ill. App. 3d 136, 143, 323 N.E.2d 42, 47 (1974).

¶ 26        Although the record does not contain respondent's motion for change of venue, it does contain the proceeding and the trial court's ruling of July 11, 2019. From the record, it would appear respondent's counsel filed, on the day the matter was set for appearances on the termination motion, a motion for change of venue as to two of the six children due to their then-current residential placement outside the county. The trial court correctly noted the transfer of venue was permissive, not mandatory. Further, since neglect proceedings are considered civil in nature, even improper venue would not deprive the court of jurisdiction to decide the motion for termination. See *In re Urbasek*, 38 Ill. 2d 535, 543, 232 N.E.2d 716, 720 (1967). The court also indicated the children were currently placed in residential facilities outside the county but that there was no indication in the record how long those placements might last. Since the granting or denial of a petition for a change of venue will not be disturbed absent an abuse of discretion (*Gouker v. Winnebago County Board of Supervisors*, 37 Ill. 2d 473, 475, 228 N.E.2d 881, 882 (1967)), there is nothing in this record to suggest it was an abuse of discretion to deny the motion. The case was, and had been, pending in Adams County since its inception. The four remaining children were all placed locally, and service providers were local as well. The court's decision to deny the motion was a proper exercise of its discretion. We agree with appellate counsel that it would be fruitless to pursue this issue on appeal.

¶ 27                    B. Termination of Parental Rights

- 13 -

¶ 28    Appellate counsel also found no arguable issues in either the procedure or the trial court's findings at the termination hearing. We agree. The Juvenile Court Act and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person" and then the State must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998)) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998))). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349, 830 N.E.2d 508, 514 (2005). A trial court's finding of parental unfitness will not be overturned unless the finding was against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208, 752 N.E.2d 1030, 1045 (2001). "Under a manifest weight of the evidence standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses ***." *D.F.*, 201 Ill. 2d at 498-99. In relevant part, section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)) provides:

"D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following, except that a person shall not be considered an unfit person for the sole reason that the person has relinquished a child in accordance with the Abandoned Newborn

- 14 -

Infant Protection Act:

* * *

(m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act."

¶ 29    Only evidence within that nine-month period alleging the respondent failed to make reasonable progress toward the return of the child may be considered by the trial court. *In re Brianna B.*, 334 Ill. App. 3d 651, 656, 778 N.E.2d 724, 729 (2002).

¶ 30    We have provided the following guidance for evaluating reasonable progress.

" ' "Reasonable progress" ' is an objective standard which exists when the court based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child.' " (Emphases in original.) *In re A.P.*, 277 Ill. App. 3d 592, 598, 660 N.E.2d 1006, 1011 (1996) (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991)).

¶ 31 We first note respondent failed to appear for the unfitness and the best-interests proceedings. During the hearing, the trial court heard testimony from two different visitation specialists that during March and April 2019, respondent failed to appear for approximately 12 visits with her children. Respondent's failure to show up for visits upset her children. When she did participate in visits, she failed to see the children's needs were met, *i.e.*, she failed to provide them with food. Due to respondent's constant failure to appear at visitation appointments, her visitation privileges were suspended in April 2019 and never reinstated.

¶ 32 The trial court also heard evidence from respondent's caseworker about her missed visitation appointments and her overall inconsistent visitation attendance. During the numerous times he confronted her and expressed concerns about her failure to visit her children, respondent provided a variety of excuses to explain her absence. At different times, she told her caseworker she was upset with the manner in which visitation was structured, she had medical appointments (for which she provided no verification), or that "it had been crazy busy." Also, even when she did attend, the visits sometimes had to be cut short due to her behavior. He stated, "her visits ended up being suspended because of her lack of involvement." On several occasions she would not be at her residence during a scheduled home visit and was uncooperative with him when they did meet. She was financially unstable and had a one-bedroom, often dirty apartment, not suitable to house six children. She was unsuccessfully discharged from her mental health counseling and failed to engage in any domestic violence services. The caseworker attempted to make contact with her during the months of September and October 2019, without success. The last communication he received from her was in November, when she informed him she moved from the area and refused to provide her current address or contact information. All of this evidence was uncontroverted. Her absence from the area was further corroborated by the court's

observation at the outset of the hearing that the last order entered by the court had been sent to her last known address and returned as undeliverable and unable to be forwarded. Accordingly, based on the record before us, we cannot find the trial court's finding of unfitness was against the manifest weight of the evidence, and therefore, we agree with appellate counsel this is not a meritorious issue to pursue on appeal.

¶ 33                                    C. Best-Interests Hearing

¶ 34            Counsel likewise finds no appealable issues in the trial court's best-interests hearing or its ruling, and we agree. Once a trial court finds a parent an "unfit person," it must next consider whether terminating that person's parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of
> the child's identity; (3) the child's familial, cultural[,] and religious
> background and ties; (4) the child's sense of attachments, including
> love, security, familiarity, continuity of affection, and the least
> disruptive placement alternative; (5) the child's wishes and long-
> term goals; (6) the child's community ties; (7) the child's need for

- 17 -

permanence, including the need for stability and continuity of

relationships with parent figures and siblings; (8) the uniqueness of

every family and child; (9) the risks related to substitute care; and

(10) the preferences of the person available to care for the child."

*In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.2d 123,

141 (2006); see also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 35 A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 36 During the best-interests hearing, the caseworker described how each of the minors were doing in placement. All of the minors have positive relationships of varying levels in their current placements and are having their needs met. Even those with problems sufficiently severe to require structured residential placement were doing better and were ensured to be receiving all necessary services. The respective foster parents have signed written permanency commitment forms with a willingness to adopt the minors. None of the children have had contact with respondent since May 2019. This evidence was also uncontroverted. The trial court noted how the minors in foster placements have bonded with the families, who are willing to provide permanence, and the minors in residential placement have bonded with staff and are having their needs provided. There was no evidence that respondent was going to be able to provide a stable home anytime in the near future. Based on this evidence, the trial court agreed it was in the

minors' best interests to terminate respondent's parental rights. Accordingly, we cannot find the trial court's decision terminating respondent's parental rights to be "unreasonable, arbitrary, or not based on the evidence." *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. For this reason, we agree with appellate counsel that an appeal in this cause would be frivolous and presents no meritorious issues.

¶ 37                    III. CONCLUSION

¶ 38        For the reasons stated, we grant respondent attorney's motion to withdraw and affirm the trial court's judgment.

¶ 39        Affirmed.